DUDLEY R. MOREAN, III, *ET AL.*, PETITIONERS-APPEL-
LANTS, v. THE BOARD OF EDUCATION OF THE TOWN
OF MONTCLAIR, IN THE COUNTY OF ESSEX AND THE
STATE BOARD OF EDUCATION, RESPONDENTS.

Argued March 16, 1964—Decided May 4, 1964.

Mr. *Morris M. Schnitzer* argued the cause for appellants (*Messrs. Kasen, Schnitzer & Kasen,* attorneys; *Mr. Waldron Kraemer,* on the brief).

Mr. *Charles R. L. Hemmersley* argued the cause for respondent The Board of Education of the Town of Montclair.

Mr. *Joseph A. Hoffman,* Deputy Attorney General, argued the cause for respondent The State Board of Education (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

PER CURIAM. For many years Montclair had four junior high schools known as Hillside, George Inness, Mt. Hebron and Glenfield. As early as 1948 a professional survey group advised that a better and more economical educational program could be provided by fewer and larger junior high schools but no action to that end was taken at that time.

Nevertheless the subject remained as a live one and in 1961 a group known as the Taylor Committee was appointed to study Montclair's junior high and elementary school facilities. The charge or instruction to the committee referred to the generally prevailing view that a sounder junior high school program could be developed with fewer units, and it expressed the hope that the committee would engage in careful study and make its recommendations by the end of the 1962 school year.

While the Taylor Committee was functioning, the Board of Education considered specific action with respect to Glenfield, the junior high school with the smallest pupil population and the highest annual per capita cost of operation. Mrs. Halligan, president of the Montclair Board of Education, testified that it considered the Glenfield problem to be serious and one which could not properly be deferred until the Taylor report came in. In September 1961 the Board announced that, pending receipt of the Taylor report and subject to any action ultimately taken as a result of its recommendations, the Glenfield school would be closed as of the fall of 1962. It instructed Dr. Hinchey, the superintendent of schools, to submit a plan for the temporary relocation of the Glenfield pupils and he did so in November 1961. Under his plan, those pupils residing south of Bloomfield Avenue would be sent to Hillside and those residing north of it would be sent to George Inness; to relieve the crowded conditions which would result at Hillside, he proposed that some Hillside elementary pupils be sent to Southwest elementary school.

In February 1962 the Board announced that it intended to adopt Dr. Hinchey's plan. This was followed by objections which centered largely about the fact that it would intensify racial imbalance in the junior high schools. The approximate Negro population of Glenfield was then 90%, of Hillside 60% and of George Inness 18%. Mt. Hebron had no Negro pupils. Since most of the white pupils at Glenfield lived north and the Negro pupils south of Bloomfield Avenue, the superintendent's proposal would substantially increase the already

very high percentage of Negroes at Hillside. While the objections to the plan were under consideration, the Taylor Committee submitted its report dated March 27, 1962. A majority of the committee recommended that all of the junior high schools be replaced by a single centrally located junior high school and that appropriate steps be taken to that end as soon as feasible. For the interim it recommended that all ninth grade pupils be sent to George Inness, that Montclair's new three-year high school be converted into a four-year high school in combination with George Inness, and that all seventh and eighth grade pupils throughout the town be sent in alternate years to Hillside and Mt. Hebron. The majority stressed the educational and financial soundness of its proposals and the fact that they would bring about total integration in the junior high schools.

Following its receipt of the Taylor report, the Board conducted a public hearing and reached the conclusion that a single junior high school was a goal which was educationally sound and economically feasible and that steps should be taken forthwith towards its ultimate attainment by 1966. In the light of this conclusion and the objections voiced to the superintendent's proposal, the Board reconsidered the matter and on April 30, 1962 announced a new plan of relocation of the Glenfield pupils. Under it the parents of the pupils being relocated stated their first, second and third choices and a lottery then assigned them to their first choice as long as space remained available, then to their second choice, and finally to their third choice. In this manner the 183 Glenfield pupils were divided evenly among the other three junior high schools, insofar as possible on the basis of the stated preferences. Mrs. Halligan testified that such dispersal of the Glenfield pupils among the other schools was educationally desirable since "it is a distinct advantage to students to be exposed to children of all kinds of backgrounds." Dr. Hinchey testified to the same effect, noting that one of our great democratic strengths is the intermingling in our public schools of students from varying economic and social surroundings.

In July 1962 the petitioners, consisting of four junior high school pupils and one elementary school pupil, filed their petition for relief with the State Commissioner of Education, alleging that the Montclair Board had adopted "a double standard of school assignment" by applying the neighborhood school policy throughout Montclair but not as to residents of the Glenfield junior high school zone and had thereby deprived them "of the equal protection of the laws, guaranteed to them by the Fourteenth Amendment of the United States Constitution." Answer was filed by the Board, depositions were taken, a jurisdictional motion was determined adversely to the petitioners, and on July 3, 1963 the Commissioner rendered his decision. He determined that the Board's action was neither arbitrary nor unreasonable and that it had acted well within the discretionary authority granted to it by the school laws of our State, citing *R. S.* 18:6–19, 18:11–1; *Boult v. Board of Education of Passaic,* 135 *N. J. L.* 329 (*Sup. Ct.* 1947), aff'd 136 *N. J. L.* 521 (*E. & A.* 1948). He noted that while the Board's plan for relocating the Glenfield pupils, pending the anticipated establishment of a single junior high school for the entire town, did take racial consideration into account, its effect was "to minimize rather than amplify any undesirable results that might accrue from increasing the racial imbalance in Hillside school." He rejected the petitioners' contention that the Board's adoption of a plan, "even temporarily," dealing with the Glenfield pupils differently from the other junior high school pupils was unconstitutionally discriminatory, citing *Guill v. Mayor and Council of City of Hoboken,* 21 *N. J.* 574, 582 (1956). See also *Williamson v. Lee Optical of Okla.,* 348 *U. S.* 483, 489, 75 *S. Ct.* 461, 99 *L. Ed.* 563, 573 (1955); *Hudson County News Co. v. Sills,* 41 *N. J.* 220, 234 (1963). He dismissed the petition and his action was affirmed by the State Board of Education. Thereafter the petitioners appealed to the Appellate Division and we certified before argument there.

Before us the petitioners do not attack the Commissioner's determination that the Board did not act arbitrarily or unrea-

sonably or exceed the discretionary authority vested in it under our school laws. Indeed they raise no questions of state law but confine themselves to the single contention that "the double standard of pupil assignment practiced by Montclair in its junior high schools was racially motivated, with the object of controlling the racial balance of pupils, and therefore violates the equal protection guaranty of the Fourteenth Amendment of the United States Constitution." They cite no holdings which furnish even remote support but rely on broad expressions which, in context, were designed to reinforce the recognized principle that state discriminations against Negroes deprive them of the equal protection of the laws. Thus Justice Harlan's famous remark in *Plessy v. Ferguson,* 163 *U. S.* 537, 559, 16 *S. Ct.* 1138, 41 *L. Ed.* 256, 263 (1896), about the Constitution's being color blind was made in the course of his attack on the then holding that separation of the races in railroad transportation did not offend the Constitution. And Justice Clark's recent statement in *Goss v. Board of Education,* 373 *U. S.* 683, 83 *S. Ct.* 1405, 10 *L. Ed. 2d* 632 (1963), that race classifications for purposes of transfers between public schools, as there, are unconstitutional was made in a case where a transfer plan was stricken as one which was intended to and would "inevitably lead toward segregation." Here, Montclair's plan was intended to and would inevitably lead toward integration rather than segregation; furthermore it was only an interim plan, pending the anticipated day when the existing junior high schools would be replaced by a single school designed to advance the educational interests of the town while achieving total integration at the junior high school level.

 The Montclair Board's obligation was to maintain a sound educational system by the furnishment of suitable school facilities and equal educational opportunities. It could not, consistently with either sound legal principles or with sound educational practices, maintain an official policy of segregation with its inherent inequalities of educational opportunities and its withholding of the democratic and educa-

tional advantages of heterogeneous student populations. See *Brown v. Board of Education,* 349 *U. S.* 294, 75 *S. Ct.* 753, 99 *L. Ed.* 1083 (1955) ; *N. J. Const. Art.* I, *par.* 5; *N. J. S. A.* 18:14–2, 18:25–4, 18:25–5. Nor need it close its eyes to racial imbalance in its schools which, though fortuitous in origin, presents much the same disadvantages as are presented by segregated schools. See *Jackson v. Pasadena City School Dist.,* 59 *Cal.* 2d 876, 881, 31 *Cal. Rptr.* 606, 382 *P.* 2d 878, 882 *(Sup. Ct.* 1963) ; *Blocker v. Board of Education,* 226 *F. Supp.* 208, 223 *(E. D. N. Y.* 1964) ; *cf. Branche v. Board of Education,* 204 *F. Supp.* 150, 153 *(E. D. N. Y.* 1962) ; *Balaban v. Rubin,* 248 *N. Y. S.* 2d 574 *(App. Div.* 1964) ; but *cf. Bell v. School City of Gary, Indiana,* 324 *F.* 2d 209, 213 (7 *Cir.* 1963) ; *Evans v. Buchanan,* 207 *F. Supp.* 820, 823 *(D. Del.* 1962).

██ When the Board made its decision to close Glenfield (a decision which is not under attack here), it was duty bound to relocate Glenfield's pupils in a manner consistent with sound educational and legal principles. Dividing them equally between George Inness and Hillside, as originally suggested, would have greatly aggravated the already existing racial imbalance in Hillside. In seeking to avoid this, the Board acted in proper discharge of its responsibilities. The plan of relocation which it ultimately chose, dealt equally with all of the Glenfield pupils without any reference to race and without any disruption of the pupils in the other junior high schools. It presented no troublesome educational or transportation problems and brought about an increased measure of integration pending the anticipated construction of a totally integrated junior high school for the entire town. The Board's action was reasonable and there is no substance to the petitioners' contention that since its plan of relocation had some racial motivation it was violative of the fourteenth amendment. The motivation was to avoid creating a situation at Hillside which would deprive the pupils there of equal educational opportunities and subject them to the harmful consequences of practical segregation. Constitutional color blind-

ness may be wholly apt when the frame of reference is an attack on official efforts toward segregation; it is not generally apt when the attack is on official efforts toward the avoidance of segregation. The moving purpose of the Montclair Board and its fulfillment in the manner here may not sensibly be viewed as violative of the fourteenth amendment; to us the Board's action appears clearly to have been in sympathetic furtherance of the letter and spirit of the amendment and in fair fulfillment of the high educational functions entrusted to it by law.

Affirmed.

HANEMAN, J., concurring in result.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.